IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| **CARLA SMITH,** | ) |
| | ) |
| | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) Civil Action File No.: _____ |
| v. | ) |
| | ) **JURY TRIAL DEMANDED** |
| **CITY OF ATLANTA, GEORGIA,** | ) |
| | ) |
| | ) |
| **Defendant.** | ) |

# COMPLAINT

Plaintiff **Carla Smith** brings this civil rights action for relief and damages against Defendant **City of Atlanta, Georgia**, based on the following factual allegations and causes of action.

## NATURE OF THE ACTION

1. This action to correct unlawful employment practices by the City of Atlanta ("Atlanta"), a Georgia municipality, arises under Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C.A. § 2000e-3(a), and the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C.A. § 623(a)(1).

2. Plaintiff Carla Smith ("Smith") is an African American woman over 50. From 2019 until 2023, Smith was a senior-level director in the Atlanta Information Management Department, which runs the city's vast information technology structure. Despite a record of exemplary performance, Smith was terminated after months of raising internal complaints of discrimination within the department. Smith was herself targeted by younger municipal officials who seemed bent on a misguided campaign to purge middle-aged senior level information technology professionals.

3. To address Atlanta's discriminatory and retaliatory practices, Smith seeks economic damages of back pay, front pay, lost benefits, and liquidated damages under the ADEA. Additionally, Smith seeks compensatory damages for emotional distress and mental anguish under Title VII, as well as her attorneys' fees and costs of litigation.

## **THE PARTIES**

4. Plaintiff Smith is a resident of Paulding County, Georgia, and at all times relevant to this complaint was employed by the municipal government of Atlanta.

5. Atlanta is a municipal entity created by the laws of the state of Georgia, and it is an entity subject to suit under Title VII and the ADEA.

## PERSONAL JURISDICTION

6. Atlanta may be served with proper process at the City Hall address at 55 Trinity Ave., Atlanta, Georgia 30303.

## SUBJECT-MATTER JURISDICTION AND VENUE

7. Jurisdiction of this court is invoked pursuant to 28 U.S.C.A. §§ 1331 and 1343.

8. Venue is proper in this district and division under 28 U.S.C.A. § 1391(b)(1)-(2), as Defendant resides in and conducts business in this district and division and the acts or omissions giving rise to the claim occurred in the same venue.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

9. Smith filed a charge of discrimination and retaliation against Atlanta with the Equal Employment Opportunity Commission ("EEOC"), Charge No. 415-2023-12073, on September 14, 2023. A copy is attached as Exhibit A.

10. Smith subsequently received a right-to-sue letter from the EEOC and the Civil Rights Division of the Department of Justice on July 17, 2024. Copies and proof of date of receipt are attached as Exhibits B, C, and D.

## **FACTUAL ALLEGATIONS**

11. Carla Smith was hired in January 2019 as a Director of Information Technology ("IT") for the Department of Atlanta Information Management ("AIM").

12. Smith's duties included supervision of AIM's desktop support, server, and telecommunication teams, as well as an array of executive tasks including strategic management, budgeting, and vendor engagement.

13. During 2021, AIM experienced a series of changes in its leadership structure. Jason Sankey was hired in June of that year as the city's Chief Information Officer ("CIO"), a cabinet-level position in then-Mayor Keisha Lance Bottoms' administration. Sankey was AIM's highest ranking executive.

14. Sankey recruited Brittany Carter to Atlanta to serve initially as Director for IT Applications and quickly promoted her in November 2021 to the role of Chief Technology Officer ("CTO"). Also, in the fall of 2021, Chloe Broom was named Chief of Staff of AIM.

15. Sankey, Carter, and Broom were all under the age of 40 at the time of their appointments and, in the cases of Carter and Broom, remained under age 40 at all times relevant to this complaint. Sankey is Black, Carter is white, and Broom is upon information and belief biracial.

16. After Carter ascended to the CTO position, Smith reported directly to her.

17. In the late fall of 2022, Carter awarded a pay raise to a white client solutions engineer in AIM, Greg Faulkner, who reported to Smith.

18. Carter bypassed the normal procedure for compensation adjustments and declined to consult with Smith about Faulkner's pay raise.

19. Several Black employees in AIM learned of the change in Faulkner's pay and complained to Smith that they felt the raise for a single employee was unjustified and demoralizing.

20. Smith reported the concerns of disparate treatment to Carter and advised her that Faulkner's raise had been particularly jarring to the Desktop Support Team, whose overwhelmingly Black staff had to absorb extra workloads due to regular staff attrition, with no commensurate boost in pay.

21. In February 2023, a group of Black AIM staffers lodged a formal complaint about Carter to the human resources ("HR") department regarding their compensation structure, Faulkner's pay raise, and the fact that various experienced Black employees had been overlooked for promotions in favor of non–African American candidates.

22. The same group of Black AIM employees also filed a separate grievance regarding Carter and Broom that alleged that they were shown preferential treatment in that they were permitted to work remotely from their homes in Ohio while a senior-level Black employee in the department had been required to relocate to Atlanta.

23. Smith did not participate in and did not influence the HR complaints.

24. Soon after the HR complaints, in late February, and within 45 days of Smith's report to her of dissatisfaction among Black employees under her supervision, Carter informed Smith that she would be demoted to the position of business information manager.

25. Carter attributed the planned demotion to performance issues on Smith's part, but during the approximately fifteen months in which Smith reported to her, no performance concerns had been identified by Carter.

26. Smith also had never been placed on any form of performance improvement plan, which is ordinarily the prelude to demotion for Atlanta's municipal personnel; nor had she been subjected to any prior written or verbal counseling.

27. In March 2023, Smith filed her own formal HR grievance against Carter challenging the demotion. Smith also raised several other concerns that

Carter had consistently failed to award vending contracts to African American–owned companies, and that Carter had selected two non-minority-owned companies, Sentry IT and TekSystem, to service application and infrastructure without submitting a formal bid request as municipal regulations ordinarily require. TekSystem would comply with the bid process only after Carter had executed a contract with them.

28. Smith also unsuccessfully sought to obtain a meeting with an Atlanta city councilman, Antonio Lewis, to report the pattern of complaints by Black employees within AIM.

29. The HR department rescinded Smith's demotion in March 2023 but, to Smith's frustration, did not appear to conduct any broader investigation of Smith's allegations of patterns of discriminatory treatment toward Black employees.

30. In April 2023, Carter advised Smith that she planned to terminate one of Smith's direct reports, a Black woman named Sheila Douthit, who served as Senior Desktop Support Manager.

31. Smith immediately raised concerns that Douthit's termination was not supported by a history of discipline and that the purported performance-based reasons for firing her were insubstantial and at best conclusory.

32. Smith also pointedly told Carter that Douthit's status as a Black woman over 40 could be a trigger for liability for the city, particularly in light of the lack of a justifying record of poor performance.

33. Carter responded by instructing Smith to begin to construct a paper trail in order to build a foundation for Douthit's termination.

34. In addition to Smith's concerns that Douthit's performance did not merit termination, Smith suspected that Carter was motivated by the fact that several members of Douthit's team had joined in the prior February 2023 HR complaints regarding Carter.

35. In June 2023, despite Smith's earlier success in derailing Carter's effort to demote her, the senior leadership of the department put new pressure on Smith to abandon her director's role. CIO Sankey at one point suggested that it was in Smith's career interests to explore a newly posted opening for a business relations manager slot, a comment that Smith took as a veiled threat to her job security.

36. Carter followed Sankey's comments by advising Smith that she was in jeopardy of being placed on a performance improvement plan, a usual prelude to termination for Atlanta's municipal employees.

37. In July 2023, Carter opted to demote Douthit, ignoring Smith's warnings that even the less harsh sanction of demotion might still be unlawful.

8

38. In late July and August 2023, Carter began questioning Smith's team about her leadership and decision making in a blatant effort to both undermine Smith and gather ammunition for discipline, demotion, or termination.

39. On August 14, 2023, after returning from a short personal leave, Smith was fired with no grounds articulated other than a reference to the at-will nature of her job, which of course is not a license to commit discrimination or retaliation.[1]

40. Smith's termination reflected another conspicuous trend in AIM. In the period between June 2021 and the early fall of 2023, 9 employees in leadership level or executive support roles between the ages of 49 to 61 were terminated. Smith was in her early 50s at the time of her firing.

41. In fact, 9 of the 11 terminations in AIM in the referenced time frame were over 50. Another 8 senior level professionals between 43 and 60 years of age elected to transfer to other departments, most over frustration that their responsibilities were being marginalized or devalued, or that they faced unwarranted performance critiques by AIM's leadership team.

42. Carter and Chief of Staff of AIM Chloe Broom, both in their late 30s, regularly touted their intent to create a different "culture" within the AIM

---

[1] In a transparent effort to insulate the city from legal exposure, Carter reinstated Douthit to her prior manager's role just as Smith was fired.

leadership ranks. Both Carter and Broom openly remarked that too much of the existing mid management team had outdated technological skills or lacked sophistication in the most cutting-edge IT innovations. Smith and a number of peers regarded those comments as inherently age-based.

43. Carter's purge of the department left an unmistakable signature: 14 of the 21 individuals in AIM between June 2021 and September 2023 who were terminated or transferred out of the department were over 48, and 17 of the 21 were over 40. The strong majority of these displaced individuals were replaced by persons 35 or younger.

44. Smith's termination reflects simultaneously two sets of unlawful motivations: punishment for her challenges to a variety of racially discriminatory practices regarding staff and vendors, and an ageist effort to reorient the ranks of the city's information management team toward a more youthful profile.

45. Smith's firing has shattered the arc of her career. She was left unemployed as an African American woman in her 50s at a time when she had been poised to cap her career with an executive leadership role. In addition to experiencing the loss of income and future opportunities, she was emotionally devastated.

## CAUSES OF ACTION

## COUNT I

**(Retaliatory termination in violation of Title VII, 42 U.S.C.A. § 2000e-3(a))**

46.  Plaintiff Smith incorporates by reference paragraphs 1–45 of this complaint as though set forth fully and separately herein.

47.  Plaintiff Smith engaged in protected activity under Title VII in that she challenged and opposed racially discriminatory promotion practices within the Atlanta Information Management Department, including disparate treatment in pay and promotions based on race; disadvantageous treatment of African American vendors; and unlawful demotions of Black female employees over 50.[2]

48.  But for Plaintiff's protected activity, she would not have been terminated.

49.  As a result of the retaliatory conduct by the City of Atlanta, Plaintiff Smith has suffered monetary damages, including but not limited to back pay and front pay; loss of economic opportunity and future benefits; and noneconomic

---

[2] The Eleventh Circuit Court of Appeals has just reaffirmed the viability of the "sex plus"" Title VII doctrine in *McCreight v. AuburnBank, et al.*, ___ F.4th___, 2024 WL 4232440 (11th Cir. Sept. 19, 2024). The theory of liability recognizes that women in certain demographic subgroups like age over 40 can be targeted for discrimination in a manner that women outside the group are not targeted. *Id.* at *4.

damages including emotional distress, humiliation, embarrassment, and mental anguish.

## COUNT II

### (Retaliatory hostile environment in violation of Title VII, 42 U.S.C.A. § 2000e-3(a))

50. Plaintiff Smith incorporates by reference paragraphs 1–45 and 47 of this complaint as though set forth fully and separately herein.

51. Because of her participation in statutorily protected activity under Title VII as described herein, Plaintiff Smith was subjected to a series of retaliatory employment actions, including but not limited to an attempted demotion; threats of demotion and unwarranted discipline; sabotage of her standing with her subordinates; and her eventual termination.

52. Atlanta's conduct was based on Smith's protected activity, and taken collectively and in tandem, the city's actions would have dissuaded a reasonable employee from making or supporting a charge of discrimination, in effect constituting a retaliatory hostile environment.

53. As a result of the retaliatory hostile environment to which she was subjected by the City of Atlanta, Plaintiff Smith has suffered noneconomic damages including emotional distress, humiliation, embarrassment, and mental

anguish; and due to her eventual termination, she further sustained monetary damages, including but not limited to back pay and front pay, as well as loss of economic opportunity and future benefits.

## COUNT III

### (Discriminatory termination in violation of the Age Discrimination in Employment Act, 29 U.S.C.A § 623(a)(1))

54. Plaintiff incorporates by reference paragraphs 1–45 of this complaint as though set forth fully and separately herein.

55. Plaintiff Smith at the time of her termination was an individual over the age of 40.

56. But for Atlanta's determination to reduce the ranks of middle-aged senior level IT professionals during the years 2021–23, Plaintiff Smith would not have been terminated.

57. As a result of Atlanta's discriminatory conduct, Plaintiff Smith has suffered monetary damages, including but not limited to back pay and front pay, loss of future benefits, and loss of economic opportunity and future benefits.

58. Because Atlanta's age-based discrimination toward Plaintiff Smith reflects a willful violation of the protections of the ADEA, she is further entitled to liquidated damages.

## **PRAYER FOR RELIEF**

Wherefore, based on the above-stated claims, Plaintiff demands a trial by jury and that the following relief be granted:

A. Back pay, front pay, and lost benefits.

B. Compensatory damages to the extent allowed by law under Title VII.

C. Liquidated damages under the ADEA.

D. Attorneys' fees and costs of litigation.

E. Pre-judgment and post-judgment interest at the highest lawful rate.

F. Such other equitable and monetary relief as the court deems just and proper.

G. A declaratory judgment that Defendant's actions violated Plaintiff's statutory rights and that Defendant shall refrain from future unlawful discriminatory conduct in its employment practices.

Respectfully submitted the 15th day of October, 2024.

                        **HKM Employment Attorneys LLP**

                        *s/Artur Davis*
                        Artur Davis[3]
                        ASB-3672-D56A
                        2024 3rd Ave. North, Suite 212
                        Birmingham, AL 35203
                        Direct: 205-881-0935

---

[3] Artur Davis will promptly file for admission *pro hac vice* as an attorney of record in this action. Mr. Davis is licensed in the state of Alabama and the District of Columbia.

adavis@hkm.com

Jerilyn Gardner
Georgia Bar No. 139779
3344 Peachtree Rd. NE, Suite 800
Office #35
Atlanta, GA 30326
Direct: 404-446-9544
jgardner@hkm.com

**Counsels for Plaintiff Carla Smith**